IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GLENN WILSON,

        Plaintiff,

   v.

OREGON YOUTH AUTHORITY,
an Agency of the STATE OF OREGON,

        Defendant.

Civ No. 6:13-cv-01538-AA
OPINION AND ORDER

Jamie B. Goldberg
Elizabeth Lemoine
515 NW Saltzman Road, #811
Portland, OR 97229
    Attorneys for plaintiff

Ellen F. Rosenbloom
Attorney General
Jessica Spooner
Assistant Attorney General
Heather J. Van Meter
Senior Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301
    Attorneys for defendant

1   - OPINION AND ORDER

AIKEN, Chief Judge:

Plaintiff Glenn Wilson (Wilson) filed suit alleging that his employer, Oregon Youth Authority (OYA), violated Title VII of the Civil Rights Act of 1964 (Title VII), codified as 42 U.S.C. 2000e. Plaintiff first filed a complaint alleging that OYA created a racially hostile work environment involving ridicule and physical altercations with supervising staff. On October 20, 2014, Plaintiff amended his complaint to included allegations that OYA retaliated against his complaints of racial discrimination by firing him. Defendant now moves for summary judgment on both claims. The motion is denied.

## BACKGROUND

OYA is an independent department of the Oregon State government that provides custody, rehabilitation, and treatment to youth criminal offenders.

Wilson, an African-American male, was employed as a Group Life Coordinator (GLC) by OYA from July 1989 until his dismissal in February 2014. In the intervening twenty-four years, Wilson was promoted twice, first in October 1989 and later in March of 1997.

Between October 2002 and June 2004, OYA sent Wilson two letters of instruction and an official letter of reprimand for arriving late to work, as well as two infractions involving the youth he supervised. Wilson added his own account to these letters acknowledging the incidents but offering additional information.

2   - OPINION AND ORDER

Apart from notifying Wilson via letter and strongly suggesting he correct his behavior, OYA took no disciplinary action against Wilson at that time.

In a February 2006 employee conference, OYA discussed an inappropriate interaction in late January 2006 between Wilson and a youth with significant mental health issues. Again, OYA took no further disciplinary action.

In February 2008, Jeffery Canfield (Canfield) was promoted to Treatment Manager and became Wilson's supervisor.

On May 3, 2011, Canfield hit the back of Wilson's head. According to an OYA investigation the contact was a "light slap." Goldberg Decl. Ex. C at 1. Wilson responded to the contact by saying, "Don't put your hands on me. I knock yo ass out if'n you do that again." Freddi Decl. Ex. A at 3. On June 14, 2011, Wilson told his union representative, Brenda Freddi (Freddi), that he felt Canfield "had it out for him," but he was hesitant to report the incident. Id. At the urging of Andre Johnson (Johnson), an African-American GLC also supervised by Canfield, Wilson allowed Freddi to report the incident "to someone [she] trusted." Id.

On June 6, 2011, Canfield requested a meeting with Wilson to discuss behavior that Canfield considered insubordinate. Wilson requested that Freddi attend the meeting. In the meeting, Canfield said that Wilson recently refused to do a job Canfield had assigned to him while the unit was short-staffed. Wilson countered that he

3   - OPINION AND ORDER

had not refused, but stated that he would do the job "this time." Freddi Decl. Ex. A at 1. At that, Canfield became "visibly irritated" with Wilson. Id. After more discussion, Canfield waved a large file in the air and said he had been collecting evidence that Wilson was not a good employee. Freddi cautioned Canfield that his behavior was threatening and intimidating and he put the file away.

Sometime on or just before June 10, 2011, Johnson noticed a verbal disagreement between Wilson and Canfield regarding whether Wilson would complete a certain task. Freddi Decl. Ex. A at 2. Canfield then asked Johnson if he had seen the interaction and whether Johnson had heard Wilson say he would do the job. Johnson replied that he had heard Wilson agree to the job, and Canfield told him to leave the office.

On July 6, 2011, Canfield received a letter from OYA Program Director, George Covey, regarding the May 3 incident. Covey stated, "while [the incident] appears to have been intended as friendly horseplay, such conduct is unprofessional. . . and [y]our behavior was unacceptable." Goldberg Decl. Ex. C at 1. The next day, Canfield allegedly struck Johnson on the shoulder. Johnson described the contact as "forceful." Johnson Decl. ¶8. Canfield then said, "I probably shouldn't have done that." Id.

On August 19 2011, Canfield again made physical contact with Wilson, this time elbowing Wilson in the ribs. Wilson reported this

incident to the Oregon State Police.

In the months following their physical interactions with Canfield, Wilson alleges that he and Johnson were subjected to jeering from coworkers and managers, often in front of the youth they supervised. Comments included a statement by a Caucasian coworker that African-American employees need to be "slap[ped] upside the head" in order to do their job. Spooner Decl. Ex. A, Wilson Depo. at 42:7.

On September 27, 2011, OYA transferred Wilson to a different work unit where he was not under Canfield's supervision. He remained there for several weeks while OYA conducted an investigation into the August 19 altercation with Canfield. The investigation concluded and Wilson returned to his previous position.

On December 28, 2011, OYA issued a memorandum of concern to Wilson about his communications with and around youth offenders while on duty. The memorandum alleges two separate occasions on July 21 and September 28, 2011, during which Wilson allegedly made inappropriate statements such as, "You think like a white person, white people always think they're right and white people aren't good at everything" and "nigga, shut the f--- up." Smith Decl. Ex. F at 1. Wilson claims he never made either statement. Id.

The next month, OYA issued another memorandum to Wilson regarding an incident on December 16, 2011, where Wilson's

5    - OPINION AND ORDER

allegedly improper supervision of youth offenders resulted in a physical altercation between the youths. In a statement signed February 2, 2012, Wilson characterized the incident as a failure of policy; Wilson claimed that another employee inappropriately left him alone with the youths and, in accordance with OYA policy, he did not intervene for his own safety. Id. at Ex. G at 2.

On January 25, 2012, Canfield allegedly attempted to strike Wilson in the ribs with his elbow. Wilson blocked the action with his arm. Two weeks later, on February 9, 2012, Covey also allegedly attempted to strike Wilson in the ribs using his elbow. Wilson blocked this attempt as well.

On March 2, 2012, Wilson complained about the January 25 interaction with Canfield and, on April 30, 2012, OYA issued a letter of warning to Canfield about the incident.

On May 1, 2012, Canfield was demoted and transferred. According to OYA, Canfield's demotion was disciplinary, while Canfield claims to have requested the change. Goldberg Decl. Ex B, Canfield Depo. at 7:23.

On May 31, 2012, OYA sent Wilson a letter of warning about three incidents between February and May of 2012 — two involving inappropriate contact between Wilson and youth offenders under his supervision and another in which Wilson arrived late to work.

On August 22, 2012, Wilson filed charges of employment discrimination with the Equal Employment Opportunity Commission

6   - OPINION AND ORDER

(EEOC). Wilson alleged that he had been subject to "harassment, humiliation, and intimidation" by OYA supervisory staff. First Am. Compl. ¶18.

On September 14, 2012, OYA issued a letter of reprimand regarding Wilson's failure to follow proper "call-in" procedures when he was late to work on August 30 and September 5.

On April 30, 2013, OYA sent a letter of reprimand including two charges against Wilson. The first asserted that Wilson failed to properly supervise youths in early March 2013. The second referenced inappropriate interactions between Wilson and youth under his supervision as witnessed by Treatment Manager Jeff Benham on March 22 and April 13, 2013. Wilson refused to sign the letter in acknowledgment. The next week, Treatment Manager, Tom Anhalt, allegedly struck Wilson twice on his shoulder.

On August 6, 2013, Wilson met with his supervisor, Tim Vandersteen, to clarify OYA's expectations regarding punctuality.

On September 13, 2013, Wilson filed suit against OYA for creation of a racially hostile workplace.

On October 30, 2013, OYA issued a written reprimand to Wilson outlining three charges. The first lists eighteen instances between August 14 and September 21, 2013 during which Wilson was late for his shift. The second and third charges referenced two instances on August 6 and a third on September 25 where Wilson refused to respond to requests and instructions from OYA staff and management.

7    - OPINION AND ORDER

These occurrences included Wilson complaining loudly about a certain staff member, which prompted a nearby youth offender to say, "You should punch that f---ing racist." Smith Decl. Ex. K at 5. Wilson refused to sign the letter in acknowledgment.

In a letter dated February 21, 2014, OYA notified Wilson he was being dismissed. The letter outlined six charges arising from at least four separate events. The first two charges arose from an incident on November 7, 2013, during which Wilson allegedly left youth offenders unsupervised. The other four charges arose from events occurring between November 13, 2013 and Wilson's dismissal. OYA maintains that Wilson's recollection of these events varied between initial investigations and Wilson's pre-dismissal meeting on January 24, 2014. Smith Decl. Ex. A.

Specifically, OYA alleges the following occurrences justified Wilson's dismissal. On November 7, as Wilson and another GLC (Herrera) transported youths in their unit from their living quarters (Greer 3), Wilson failed to accurately count the youths, as per protocol, and left one behind. Later, as they returned to Greer 3, Wilson lead a line of the youths. He assumed that Herrera was at the end of the line; he apparently was not. Wilson Decl. ¶30. One youth, W.W., then walked behind Wilson and stated he was going to the "flats," or bathroom. Id. Wilson responded, "ok." Id. Forms posted in Greer 3 indicated that W.W. was on "suicide risk level 3" and directed staff to "[c]ontinue to be aware of [W.W.'s]

8    - OPINION AND ORDER

activities and watch him when he is in the bathroom." Smith Decl. Ex. A at 7. Wilson claims to have not read the form, despite being aware that he was required to. After a short time, another youth alerted Wilson that W.W. was "using the flats." Wilson Decl. ¶30. Wilson moved toward and then entered the "flats." In the time that elapsed between W.W. entering the "flats" and Wilson discovering him, W.W. attempted suicide by wrapping a sweatshirt around his neck.

OYA also alleges that on November 13, 2013, Wilson and other staff were assigned to monitor a classroom where one youth was "using inappropriate language and not being compliant." Id. ¶32. The youth allegedly tipped over a table and called the teacher a "stupid bitch." Smith Decl. Ex. A at 8-9. In a meeting investigating this incident, Wilson was allegedly "disrespectful and dismissive." Id. at 9.

Finally, OYA maintains that, on December 5, 2013, Wilson failed to bring one youth's suicide watch form as he transported the youth to school. This was a violation of "OYA local operating protocol." Id. at 4. Wilson was not aware of the emphasis OYA placed on the importance of these forms, as OYA had communicated this emphasis while he was temporarily assigned to other units Wilson Decl. ¶33. Two days later, Wilson "raised his voice" to a youth who wrongfully had a staff bike. Id. ¶35. One coworker who witnessed the event told OYA that Wilson "berated [the youth] and

9   - OPINION AND ORDER

. . . attempted to provoke him." Smith Decl. Ex. A at 12.

After his termination, Wilson amended his complaint to allege retaliation. OYA now seeks summary judgment on both claims.

## STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324. A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the Ninth Circuit has refused to find a genuine issue of fact where the only evidence presented is "uncorroborated and self-serving" testimony. Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996).

## DISCUSSION

A. Racially Hostile Workplace

Wilson alleges that OYA's actions violated his right to work in an environment free from discriminatory intimidation, ridicule, and insult, thereby creating a racially hostile work environment.

See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986). In Harris v. Forklift Systems, Inc., the Court concluded that the phrase "terms, conditions, or privileges of employment" in 42 U.S.C. 2000e-(2)(a)(1) manifests a congressional intent to encompass a wide range of potentially harmful employer activity, adding that discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of employment violates Title VII. Harris, 510 U.S. 17, 21 (1993).

Importantly, however, "Title VII is not a 'general civility code.'" EEOC v. Prospect Airport Servs., 621 F.3d 991, 998 (9th Cir.2010) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). Behavior that merely engenders offensive feelings but is not severe or pervasive does not implicate Title VII. Harris, 510 U.S. at 21-22. Rather, Title VII protects individuals from harassment that is discriminatory, frequent, and abusive. Id. at 22.

In order to survive summary judgment, Wilson must show: 1) he was subjected to verbal or physical conduct because of his race; 2) the conduct was unwelcome; and 3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003); Henry v. Regents of the Univ. of Cal., 37 F. Supp. 3d 1067, 1076 (N.D. Cal. 2014). Wilson must establish that the work environment was both subjectively and

11    - OPINION AND ORDER

objectively hostile. <u>Prospect Airport Servs.</u>, 621 F.3d at 999 (the court considers "not only the feelings of the actual victim," but also assumes "the perspective of the reasonable victim"); <u>Nichols v. Azteca Rest. Enter.</u>, 256 F.3d 864, 871-72 (9th Cir. 2001).

In determining whether Wilson's work environment was so hostile as to violate Title VII, this Court must consider all the circumstances, including the frequency of the conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the plaintiff's work performance. <u>Prospect Airport Servs.</u>, 621 F.3d at 999; <u>Thompson v. Donahoe</u>, 961 F. Supp. 2d 1017, 1028 (N.D. Cal. 2013). Courts should also consider whether the employer, once aware of the conduct at issue, failed to take adequate remedial and disciplinary action. <u>Steiner v. Showboat Operating Co.</u>, 25 F.3d 1459, 1463 (9th Cir. 1994).

Wilson offers evidence of the July 2011 meeting where Canfield was briefly "threatening and intimidating." Freddi Decl. Ex. A at 3. He also refers to a handful of comments and jokes made by co-workers. In his deposition, however, Wilson testified that he believed his co-worker's jokes were intended to be funny and supportive, showing that he did not subjectively perceive them as hostile. Spooner Decl. Ex. A, Wilson Depo. at 38-43. Moreover, this Court has held previously that a single incident of a non-supervisory employee uttering a racial epithet is insufficient to

establish a hostile work environment claim. Hotchkins v. Fleet Delivery Service, 25 F. Supp. 2d 1141, 1149 (D. Or. 1998). Notwithstanding the alleged inappropriate nature of these comments, they do not support Wilson's allegations of a racially hostile workplace.

Wilson also points out that he suffered five instances of unwelcome physical contact over almost two years. Specifically, plaintiff asserts that: 1) on May 3, 2011, Canfield slapped him on the back of the head; 2) on August 19, 2011, Canfield pinched him in the ribs; 3) on January 25, 2012, Canfield attempted to elbow him in the ribs; 4) on February 9, 2012, Program Director Covey attempted to elbow him in the ribs; and 5) on May 7, 2013, Treatment Manager Anhalt struck him twice on the shoulder. While not necessarily pervasive, there remains a question of fact whether the alleged conduct was "extremely severe," given the physical actions alleged. See Brooks v. City of San Mateo, 229 F.3d 917, 926 (9th Cir. 2000).

Wilson also asserts that only African-American employees were subjected to Canfield's "horseplay" and offers evidence that his co-worker, Johnson, perceived racial animus in Canfield's actions. Johnson Decl. ¶5. Johnson urged Wilson to report the contact and described it as reminiscent of "a master of a plantation hitting an African-American slave." Id. Johnson's statement suggests that Canfield's conduct could be considered objectively hostile. Wilson

also alleges that a Caucasian coworker jokingly stated that African-American employees need to be "slap[ped] upside the head," further supporting Wilson's allegation that the physical contact was racially motivated. Spooner Decl. Ex. A, Wilson Depo. at 42:7. While OYA contends that it took action by demoting Canfield, Wilson offers evidence that Canfield requested the change in his position.

Finally, the significant increase in disciplinary action taken toward Wilson during the alleged hostile conduct could lead a fact-finder to determine that the physical interactions interfered with his work performance. In the light of the entirety of the circumstances, Wilson's evidence presents genuine issues of material fact, and summary judgment is inappropriate.

B. Retaliation

Wilson's second claim for retaliation is distinct in that Wilson does not assert that OYA's adverse employment action — his termination — was racially motivated. Rather, Wilson alleges that he was fired in retaliation for filing an EEOC complaint and this lawsuit. At oral argument, Wilson clarified that his retaliation claim is also based on OYA's reprimands after Wilson initially complained of racial harassment.

As with his first claim, Wilson bears the initial burden of establishing a prima facie case of retaliation. To do so, he must show that: 1) he acted to protect his Title VII rights; 2) an adverse employment action was taken against him, and 3) a causal

link exists between these two events. <u>Steiner</u>, 25 F.3d at 1464. Significantly, the causal link in Title VII retaliation claims must be proved under "but-for" causation standards. <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2533 (2013). In <u>Nassar</u>, the Court relied on Congress' amendments to Title VII, which specifically added the words "motivating factor" to the status-based discrimination clause while leaving unchanged the "because of" causation standard in the retaliation clause. <u>Id.</u> at 2528-30. Thus, Wilson must show that OYA would not have taken adverse employment actions against him but-for his Title VII protected activity.

Here, Wilson meets the first two elements: he complained about racial harassment and discrimination, and he suffered adverse employment actions in the form of reprimands and, ultimately, termination. Regarding the causal link between these, typically but-for causation is a question of fact. <u>E.g.</u>, <u>Eng v. Cooley</u>, 552 F.3d 1062, 1072 (9th Cir. 2009). Accordingly, the Court should grant summary judgment only if OYA shows "that it would have made the same employment decisions even absent the [protected activity]." <u>Id.</u>

Although Wilson does not refute OYA's most basic assertions about the events listed in his dismissal letter, he maintains that the occurrences were not as severe as OYA claims. <u>See</u> Pl.'s Response at 26-31. Wilson also provides evidence from Freddi that

15    - OPINION AND ORDER

the charges leveled against Wilson usually do not result in termination or even a reprimand. Freddi Decl. ¶9-14. Wilson further emphasizes that other OYA employees were involved in the same incidents, and yet, those employees apparently suffered no disciplinary action.

OYA maintains that Wilson's job-related conduct precipitated his reprimands and termination, not his complaints, and that it would have made the same decisions regardless of the complaints. However, the evidence reflects that OYA reprimanded Wilson five times in the first twenty-two years of his employment. In the two-and-a-half years following his initial complaint to Brenda Freddi, OYA issued seven written reprimands and held at least six employee conferences. In other words, Wilson did not receive significant disciplinary action until he complained of racial harassment.

These facts, taken in the light most favorable to Wilson, compel the conclusion that genuine issues of material fact preclude summary judgment.

## CONCLUSION

Defendant's Motion for Summary Judgment (doc. 54) is DENIED.
IT IS SO ORDERED.
Dated this 24th day of July, 2015.

*Ann Aiken*
Ann Aiken
United States District Judge

16 - OPINION AND ORDER